THE PEOPLE, Plaintiff and Respondent, v. GERALD
ROBERT ACOSTA, Defendant and Appellant.

Chandler & Duncan and Elinor Chandler for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack E. Goertzen, Deputy Attorney General, for Plaintiff and Respondent.

HERNDON, J.—Defendant appeals from a judgment entered after a nonjury trial, convicting him of possession of heroin for purpose of sale in violation of section 11500.5 of the Health and Safety Code.[1]  We shall recite the essential facts reflected by the record viewed in the light most favorable to the respondent as required by the familiar rule.

On December 27, 1961, Officer John Hanks of the Los Angeles Police Department was informed by an arrestee that a dealer in heroin lived on Calzona Street in Los Angeles and could be called at a stated telephone number.  The officer was advised also that this dealer was known as "Jerry" and drove a 1953 blue Plymouth.  Officer Hanks checked the telephone number through the telephone company and determined that it was listed in appellant's name at 1073 Calzona Street.  He then checked the identification records of the police department and discovered that appellant had suffered a prior conviction for possession of narcotics.  The officer removed the photograph from the file and his informant identified the person pictured therein as the dealer known to him as "Jerry."

Since Officer Hanks had not previously received information from this particular informant, the officer took additional steps to test the verity of his statements.  He arranged

---

[1]Section 11500.5 of the Health and Safety Code provides in part as follows: "Except as otherwise provided in this division every person who possesses for sale any narcotic other than marijuana shall be punished by imprisonment in the state prison for not less than five years nor more than 15 years, and shall not be eligible for release upon completion of sentence, or on parole, or on any other basis until he has served not less than 2½ years in prison."

with a fellow officer, Allan Archbold, to call the indicated number while he, Officer Hanks, stationed himself outside the Calzona Street residence. Hanks arrived at the residence at 1:45 p.m. that day and called his fellow officer to advise him to proceed with the planned operation. Officer Archbold dialed the indicated number and upon hearing it ring, he handed the instrument to the informant while he listened in on an extension. After the telephone rang several times, a woman answered, and when the informant asked for Jerry, she advised him that he was not at home, but would be back later. Officer Archbold informed Officer Hanks of this development.

At approximately 2:10 p.m. Officer Hanks observed a blue 1953 Plymouth drive up and park at the Calzona residence. He thereupon contacted Officer Archbold to place the call again. The same procedure was followed in the placement of the call, and this time a man answered and the following conversation was heard: "Informant: Hello, Jerry? Voice on the other end of line: Yes. Informant: This is Jimmy. I would like to get a quarter. . . . Voice: I don't have that much. How much do you have? Informant: I have about $60.00. Voice: Well, I will give you about two and one-half spoons for that. . . . Informant: When, and how long would it be? Voice: It will take me a few minutes to package it up, and I will deliver it to your pad in about ten minutes. Informant: Okay."[2]

Officer Hanks was informed of this development and thereupon awaited results at the Calzona residence. About five or ten minutes later appellant emerged from the residence with a woman later determined to be his wife, and got into his car. The officer was able to identify him from the photograph taken from the criminal records. The officer immediately pulled up alongside the car and, as he did so, he saw appellant look in his direction then make a "swallowing motion." Appellant thereupon was taken from the car and handcuffed, whereupon the parties immediately entered the residence from which appellant had just emerged. This residence appears to have been separated into two sets of living quarters. The officer checked the two telephones until he determined which carried the number in question. Appellant himself testified that the number for this telephone did

---

[2] The expressions "a quarter" and "two and one-half spoons" were defined as being units of measurement employed in the jargon used by heroin peddlers.

not appear on the front of the instrument, because it was covered by a photograph, but that the officer verified the number by placing a call therefrom to the telephone company. The living quarters wherein this telephone was located, and which appellant concedes were occupied by him, were then searched.

In appellant's room Officer Hanks found a plate with a trace of heroin powder upon it, 125 capsules of heroin and 11 grams of loose powder. In addition, the officer discovered a paper bag containing a can partially filled with milk sugar, a razor blade located near the plate heretofore mentioned, and a box containing empty gelatin capsules. The officer, who had qualified as an expert in the field of narcotics, testified that milk sugar is commonly used for the purpose of diluting heroin and the gelatin capsules are used for packaging heroin for sale.

When questioned in reference to the heroin found in his room, appellant stated that it was his. He also stated that he had swallowed "two and one-half spoons" outside the house. On being asked where he was going when apprehended, he replied, "You know where I was taking it to." He denied that he was using heroin and the officer observed no evidence of use at that time. Officer Archbold testified that the voice he had heard on the telephone was "very similar" to appellant's voice.

By way of defense, appellant testified that only part of the heroin discovered was his and that he kept the portion owned by him for his own use and not for purposes of sale. He asserted also that the empty capsules did not belong to him but refused to state to whom they did belong. He denied having engaged in the conversation and the making of the admissions as testified to by the officers.

It is at once apparent from the foregoing recital that the procedure followed by the police officers in this case was excellent and well deserving of commendation for the careful consideration given to the public interest, to the protection of the privacy and rights of the suspected party, and to the transcendent necessity of removing from the body of society those who would spread the alarmingly noxious canker of narcotics.

Despite this patently obvious fact, appellant makes the usual and almost routine assignment of error: (1) that the police had no reasonable grounds for "arresting" him in the manner described, and (2) that the search of his resi-

dence which followed was unreasonable and in violation of his constitutional rights.

We regard it our duty to examine and dispose of these assignments, but also to refrain from burdening the reports with any lengthy recital of appellant's fallacious arguments. ▆ With respect to the first assignment, it is sufficient to say that where information supplied by an untested source is independently corroborated by the police, an arrest based thereon is fully warranted. (Cf. *People* v. *Whyte*, 199 Cal. App.2d 641, 645 [18 Cal.Rptr. 889]; *People* v. *Ferrera*, 149 Cal.App.2d 850, 855-856 [309 P.2d 533].) ▆ Without repeating the evidence, it is clear that the facts known to Officer Hanks at the time he approached appellant's car, plus appellant's furtive act in swallowing, was sufficient to establish probable cause and justify his arrest.

With reference to the second assignment, we feel that a citation to the remarks of this court in *People* v. *Aleria*, 193 Cal.App.2d 352, 356-359 [14 Cal.Rptr. 162], will provide an adequate disposition without a repetition by quotation here. It is common knowledge among those familiar with the illegal traffic in narcotics, including those whose familiarity stems only from reading the records on appeals from judgments of conviction in these cases, that sellers frequently carry their stock in trade to their appointed places of delivery in balloons secreted in their mouths. ▆ From the prior telephone conversation, the police knew that appellant's residence was the headquarters of his operations and that he had just ''packaged up'' the ''two and one-half spoons'' of heroin which apparently he swallowed upon his apprehension. As part of one continuous operation, with no substantial lapse of intervening time or distance, it was entirely reasonable and proper for the officers to search out appellant's supply of contraband and seize possession thereof.

Lastly, appellant argues the insufficiency of the evidence to sustain the judgment. It appears to be his contention that this court should (a) reweigh the evidence and accept his testimony to the effect that he kept part of his large supply of narcotics on hand as a favor to his unnamed friends and the remainder for his own use; (b) reject the testimony of the officers regarding the telephone conversation wherein appellant agreed to sell a quantity of heroin; and (c) disregard his admissions thereafter made concerning their knowledge of his destination when he was apprehend-

ed.   Manifestly, these arguments are without merit.

The judgment is affirmed.   The purported appeal from "all motions" is dismissed.

Fox, P. J., and Ashburn, J., concurred.