[Crim. No. 9643.   Second Dist., Div. Four.   Sept. 22, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. MANUEL CATALAN GONZALO PEREDA, Defendant and Appellant.

Robert H. Lund and Lund & Brunner, under appointment by the District Court of Appeal, for Defendant and Appellant.

Stanley Mosk and Thomas C. Lynch, Attorneys General, William E. James, Assistant Attorney General, and Peter Graber, Deputy Attorney General, for Plaintiff and Respondent.

JEFFERSON, J. — By information, defendant Pereda, together with three codefendants, Betty Garcia, Jerry Martin and Florence Martinez, were charged, in count one, with illegal possession of heroin in violation of Health and Safety Code, section 11500, and in count two, with possession of heroin for sale, in violation of Health and Safety Code, section 11500.5. Defendants Garcia and Martinez pled guilty to count two. Defendant Martin pled guilty to count one. A jury found defendant Pereda guilty as charged. Motions

for new trial and probation were denied and Pereda was sentenced to state prison as to count two only, for the term prescribed by law. He appeals from the judgment.

At approximately 2 p.m. on April 19, 1963, Narcotics Officer Locke of the Long Beach Police Department received information from a narcotics officer of the Orange County Sheriff's Office that Betty Garcia, a narcotics offender then free on bail pending a hearing on a narcotics charge, had moved from Orange County to a motel located in the 1700 block on East Ocean Boulevard in Long Beach. The information further related that the Orange County Sheriff's Office had been told by an informer* that Miss Garcia was dealing in narcotics and had five ounces of heroin then in her possession; that about five people were working for her and that she drove a 1946 Chevrolet.

Half an hour after receiving this information, Locke and another officer went to the Beach Motel in the 1700 block on East Ocean Boulevard. The manager of the motel told the officers that there was a Mexican woman matching the description of Betty Garcia occupying apartment 49 of the motel; that this apartment was also being occupied by another Mexican woman and a man who did not appear to be of Mexican descent. The motel registration card indicated that the occupants of apartment 49 were driving a 1946 Chevrolet registered in the name of Mr. and Mrs. Jerry Martin of Anaheim. The manager also permitted the officers to view a record which he kept of telephone messages received by the occupants of apartment 49. This record indicated that there were phone calls from Orange County, Los Angeles, and from Tijuana, Mexico.

An around-the-clock surveillance of apartment 49 was then begun from a vantage point in another apartment of the motel. Officer Locke observed that the venetian blinds in apartment 49 were tightly drawn during the daytime while the blinds in the other apartments were open. He further observed that someone in apartment 49 would part the blinds and look out whenever an automobile or person passed by.

At 6 p.m., on the same day, Narcotics Officer Hitchings, who was also on the stakeout, observed a male Mexican enter the apartment and leave after about five minutes. Hitchings followed him and observed that he entered an automobile containing three other male Mexicans. The officer interro-

---

*There is no contention that this was a reliable informer.

gated the men, learning that they all had narcotic records. After a short time Officer Hitchings observed that a second male Mexican approached the apartment and knocked on the door; he was refused admittance. The same evening at approximately 10 p.m., Officer Hitchings observed a woman matching the description of Betty Garcia leave apartment 49 and approach a 1946 Chevrolet parked nearby. He saw her reach down near one of the wheels of the car and appear to pick up something. She then opened the door of the car, leaned inside and appeared to replace or remove something from under the front seat. As she left the car she had a white object in her hand. She discarded the object and reentered the apartment. Hitchings picked up the object and found it to be two white paper napkins containing what appeared to be carbon deposits. The officer was of the opinion that the material on the napkins had resulted from someone wiping off a spoon that had been heated, a practice commonly used in the process of administering narcotics.

On Sunday, April 21, at approximately 12:45 a.m., Officer Castillo, who was also attached to the narcotics detail of the Long Beach Police Department, observed defendant Pereda arrive at the motel in a taxicab and enter apartment 49. The officer was told by the cab driver that he had picked up defendant at the Greyhound bus depot. Defendant Pereda left the motel about two hours later, at approximately 3 a.m., accompanied by a Mexican woman (later identified as codefendant Martinez). They drove to the Greyhound bus depot. Defendant Pereda entered the bus depot and codefendant Martinez returned to the apartment. Officer Castillo approached Pereda, identified himself and stated in Spanish that he and his partner were conducting a narcotics investigation and that they were of the opinion that defendant had just delivered a quantity of narcotics to the motel. Pereda denied this but admitted he had visited codefendant Garcia at the motel. Defendant was then arrested and searched. The officers had no warrant for defendant's arrest. The search of defendant's person uncovered a piece of paper containing the name "Betty," a phone number and the room number and address of the apartment which they had under surveillance.

An hour and a half later, at approximately 5 a.m., officers Hitchings, Locke, Castillo, Miller, Ondrick and Penhollow entered apartment 49, using a key obtained from the motel

manager. They had no warrant for arrest or search. The officers aroused Miss Garcia and Miss Martinez, who were sleeping in the bedroom and awakened Martin, who was asleep in a bed in the front room. The apartment was then searched and a considerable quantity of heroin was found. The officers were of the opinion from their observation of codefendants Garcia, Martinez and Martin, that they all were narcotics users and that Garcia and Martin were then under the influence of narcotics.

Defendant Pereda subsequently made a statement to the police in which he admitted that he worked for a major pusher of narcotics who operated out of Tijuana; that he had delivered narcotics to defendant Garcia and that this was the third delivery he had made to Miss Garcia.

■ Defendant contends that his conviction was based on evidence secured illegally by the police. He argues that the heroin found in Miss Garcia's apartment was secured as the result of an unlawful search and seizure and that the confession made by him resulted from his being illegally arrested.

Because the search, seizure and arrest were accomplished by the officers without benefit of a search or arrest warrant, the pivotal question involved in this case is whether the prosecution has carried its burden of showing that, when the arresting officers entered the apartment in which they subsequently discovered the contraband, they had reasonable or probable cause to believe that its occupants were illegally selling or possessing narcotics, or in other words, of showing proper justification for their entry. (*People* v. *Shelton,* 60 Cal.2d 740, 744 [36 Cal.Rptr. 433, 388 P.2d 665]; *People* v. *Reeves,* 61 Cal.2d 268, 272 [38 Cal.Rptr. 1, 391 P.2d 393].)

■ The information provided by the anonymous informer would not alone be sufficient to constitute reasonable or probable cause. (*People* v. *Reeves, supra,* 61 Cal.2d 268, 273; *Willson* v. *Superior Court,* 46 Cal.2d 291, 294 [294 P.2d 36].) As stated in the *Willson* case, *supra,* at page 294, "[A]n arrest may not be based solely on such information [citations], and evidence must be presented to the court that would justify the conclusion that reliance on the information was reasonable." (See also *People* v. *Reeves, supra,* 61 Cal. 2d 268, 273.) ■ Or, as said in the *Reeves* case, *supra,* at page 274, "[T]he information gained from an informer or arrestee is insufficient unless corroborated, *in essential respects,* by other facts, sources or circumstances." [Italics added.]

■ The Attorney General contends that the information which the officers received was corroborated by the personal observations of the officers themselves during the surveillance of approximately three days of the suspect apartment. Reviewing these observations, the officers had determined that a female matching the description of the woman reportedly engaged in the illegal activity was occupying an apartment in the 1700 block of East Ocean Boulevard, as the information had indicated; that she was living there with two other persons; that some telephone messages to the apartment came from Tijuana, Mexico. (The officers theorized that defendants were part of a narcotics ring smuggling narcotics to the United States from Mexico.) The officers observed that the occupants of apartment 49 kept the blinds of their apartment drawn and were seen to look out on occasion when someone passed by. The officers saw Miss Garcia drop two paper napkins outside of the apartment which one of the officers thought had been used to wipe off a spoon, heated during preparation for the taking of a narcotic injection. One person of Mexican extraction was seen to enter the apartment, leave after remaining approximately five minutes and get into a car containing three other persons. All four had narcotic records. One other person of Mexican extraction was refused admittance to the apartment. Defendant was then seen to enter the apartment after arriving from a bus depot, stay approximately two hours and then be driven, by one of the occupants of the apartment, back to the bus depot, where his arrest then took place. Armed with this information, approximately two hours later, at 5 a. m., the officers entered apartment 49, unannounced, using a passkey.

We do not find such observations to be substantial corroboration of the essential fact as to whether these persons were then violating the law. (*People* v. *Reeves, supra,* 61 Cal. 2d 268, 274.) ■ No citation of authority is necessary for the well established proposition that the search cannot be justified by what it turns up.

■ Moreover, we deplore the manner and the timing of the officers' entry. As stated in *People* v. *Reeves, supra,* 61 Cal.2d 268, 273, "It is well settled by both federal and state decisions that 'an entry obtained by trickery, stealth or subterfuge renders a search and seizure invalid.' [Citations.]" ■ We can see no compelling reasons under the circumstances here presented for six police officers to walk unannounced into an apartment occupied by three narcotic

suspects, two of whom were women, at 5 o'clock in the morning; to rouse them from sleep, and then to search their apartment. The conduct is not saved from censure by the belated call for a policewoman, who, after the entry had been effected, conducted the physical examination of the two women in the apartment. The conduct of the officers here constituted an even greater invasion of the privacy of the suspects than did the conduct condemned by the Supreme Court of the United States in *Irvine* v. *California,* 347 U. S. 128 [74 S.Ct. 381, 98 L.Ed. 561]. ■ As was said in the reecnt case of *People* v. *Burke,* 61 Cal.2d 575, 578 [39 Cal.Rptr. 531, 394 P.2d 67]: "Where officers are not responding to an emergency there must be compelling reasons and exceptional circumstances to justify a search in the absence of a search warrant. [Citation.]" We find no such reasons or circumstances here present.

The following language used by the court in the *Reeves* case, *supra,* is particularly applicable here:

"It is, of course, highly commendable that law enforcement officials should desire that all persons violating the law should be arrested and punished. But it is of even greater importance, that in seeking to attain that highly desirable end, law enforcement officials should not trample upon or disregard fundamental constitutional rights. The end does not justify the means. When the desire to punish the lawbreaker runs afoul of constitutional rights, it is the former that must give way. The courts should be alert to see that this is so. It is a fundamental concept of our system of criminal justice that it is better for society that a few criminals escape, than it is for government to use illegal means to accomplish their convictions. For that reason the court cannot and should not struggle to escape the obvious mandate of the constitutional provisions. That is the problem here involved. Constitutional considerations determine that the search and arrests were illegal. Therefore, convictions based upon the illegal search and arrests cannot stand." (*People* v. *Reeves, supra,* 61 Cal.2d 268, 275.)

The judgment of conviction is reversed.

Burke, P. J., and Kingsley, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied November 19, 1964. Mosk, J., did not participate therein. Schauer, J., was of the opinion that the petition should be granted.