[Crim. No. 6143. First Dist., Div. Four. June 30, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. FREDDY LEROY SATTERFIELD, Defendant and Appellant.

J. Raymond Cullum for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, Elizabeth Miller and Clifford L. Schoffer, Deputy Attorneys General, for Plaintiff and Respondent.

CHRISTIAN, J.—After a nonjury trial, defendant appeals from a judgment of conviction of violation of section 11500 of the Health and Safety Code (possesion of heroin). The evidence most favorable to the judgment establishes that appellant had in his possession at the time of his arrest a small quantity of heroin and a kit of paraphernalia to be used for injection of that narcotic. The only question in the appeal is whether the officer who broke into appellant's home to make the arrest had reasonable cause to believe appellant guilty of a felony.

On January 7, 1965, Steven Priolo and Steven Levine were arrested in the residence at 4549 Lomina Street, Los Angeles. A search of the house turned up a quarter-ounce of marijuana in the northeast bedroom. This information was communicated to Sanchez and Hill, experienced deputies assigned to the narcotics detail in the Los Angeles County sheriff's department. These officers interrogated Priolo and Levine on January 9. According to the informants, Levine had been living at 4549

Lomina Street, and Priolo was visiting there when both were arrested. They told the officers that the room in which the marijuana had been found was appellant's bedroom. Priolo also stated that on four occasions prior to January 7 he had bought heroin from appellant. Deputy Sanchez testified that he considered Priolo a reliable informant but gave no basis for his opinion.

After talking to the informants, Sanchez "sent for record checks" and "obtained a record check from C.I.I. and the F.B.I." concerning appellant. The officer testified that a "record check" is also known as a "make sheet" and, in substance, recites "the charge, the date, the organization that arrested him and the disposition. . . ." If appellant's make sheet contained any such information, the witness was not asked to relate it in his testimony and respondent's case draws no support from it.

Deputy Hill testified that Deputy Sanchez told him "that he had a conversation with a neighbor of the Defendant and Deputy Sanchez stated that the neighbor had told him that the Defendant had acted suspiciously." The conversation with the neighbor took place three weeks after the disclosures by Priolo and Levine.[1]

At this point the two officers drove to 4549 Lomina Street about noon on February 1, 1965. Both were in plain clothes; their car was an "undercover" police vehicle. They did not have a search warrant or a warrant for appellant's arrest. The officers did not originally intend to enter the house or arrest appellant; they wanted to talk with him about the marijuana found in the bedroom three weeks earlier and about his "purported activities in narcotics."

The officers saw appellant driving in the neighborhood and followed him to the driveway at 4549 Lomina Street, where he turned in. Deputy Hill recognized him from a police "mug shot." They drove past, returned, and drove into the driveway. By that time appellant's vehicle had been parked in a

---

[1] When Deputy Hill so described the conversation between Sanchez and the neighbor, appellant moved to strike his testimony, "regarding what the neighbor said" as being hearsay, not related to probable cause and a conclusion of both the neighbor and Deputy Sanchez. The trial court "overruled" the motion. Earlier, Deputy Sanchez himself described the conversation with the neighbor. His recital was substantially more factual than the Hill version, but the trial court struck the Sanchez testimony upon appellant's motion. Although the only remaining evidence of any disclosures by the neighbor-informant is Deputy Hill's version—once removed and such as it is—the unstricken testimony of Deputy Sanchez shows that he talked to the neighbor by telephone on January 29, 1965.

detached garage opposite the rear of the house, and appellant was walking from the garage to the house. As the officers' car entered the driveway, appellant ''looked up and he ran'' to the house. Deputy Hill, driving the police car, accelerated and drove it to the rear of the house. He yelled, ''Sheriff's Department'' after he had stopped the car and alighted, and just as appellant slammed the back door of the house from the inside. Deputy Sanchez yelled, ''Sheriff's officers,'' but after appellant had slammed the door.

Through an open window Deputy Sanchez heard a voice in the house say, ''The law. It's the law.'' Deputy Hill also heard a voice, but testified that the words were, ''It's the law. The law is here.'' Both officers heard some ''scuffling and running'' noises in the house. A female voice inside said ''Where? Where, outside?'' Sanchez then heard sounds of an opening window and a screen being ripped. He ran around the house and intercepted a woman, one Denise Whalen, who was crawling out of a window. She was placed under arrest.

Meanwhile, Deputy Hill formed the opinion that appellant was attempting to destroy narcotic evidence inside the house. The opinion was based upon the circumstances we have just related and his knowledge, derived from his experience, that a common method of destroying narcotics is to flush them down a toilet after which they cannot be recovered. Hill did not believe he had time to get a search warrant or do anything else ''to prevent the destruction of narcotics except enter that house.'' Accordingly, he ran to the front door, kicked it open without announcement and entered.

When Deputy Hill broke in, he saw appellant at a telephone, screaming incoherently into it and holding his left hand in a coat pocket. The officer approached him at gunpoint, told him he was under arrest, and grabbed his coat. Appellant broke loose and ran out the front door and across the front lawn. Running into a neighboring back yard with Hill in close pursuit, appellant withdrew an object from his pocket and threw it over a fence into another yard. Hill caught him and subdued him after a scuffle.

Sanchez responded to Hill's call for help and at the point where appellant had thrown the object from his pocket they recovered two cellophane bags, each of which held two paper bindles of heroin, and a cloth package containing an addict's typical kit for preparation and injection of heroin. The officers then searched the house and found other incriminating articles.

The trial court admitted in evidence the material thrown away by appellant, expressing the view that the evidence was discovered because appellant voluntarily disclosed it without a search.[2] This theory was erroneous. ▮ Evidence obtained in consequence of a suspect's voluntary act is unlawfully seized if the act was the "direct result" of illegal police conduct. (*People* v. *Dixon* (1956) 46 Cal.2d 456 [296 P.2d 557] [contraband obtained when suspect took key to hiding place from her dress and attempted to swallow it while in custody after unlawful arrest]; *Badillo* v. *Superior Court* (1956) 46 Cal.2d 269 [294 P.2d 23] [suspect ran out of a house unlawfully entered by officers and threw away a package of heroin]; *People* v. *Stewart* (1966) 241 Cal.App.2d 509 [50 Cal.Rptr. 630] [suspect concealed contraband in police car while en route to sheriff's office after unlawful arrest based on uncorroborated information from untested informant].) Here the evidence thrown away by appellant was unlawfully obtained unless the forcible entry into the house was lawful.

Deputy Hill had neither a warrant nor the consent of the occupants; therefore the entry was lawful only if he had reasonable cause, based on all of the facts known to him at that moment, to arrest appellant inside the house. (*People* v. *Shelton* (1964) 60 Cal.2d 740, 744 [36 Cal.Rptr. 433, 388 P.2d 665].) The admissibility of the evidence seized in the house later, after the officers reentered, turns upon the same question. The search was "substantially contemporaneous" with appellant's arrest and it took place on the premises where the arrest was made. It was therefore lawful if the arrest to which it was incident was lawful. (*People* v. *Cockrell* (1965) 63 Cal.2d 659, 666 [47 Cal.Rptr. 788, 408 P.2d 116].)

An arrest without a warrant is lawful if made by a peace officer who has reasonable cause to believe that the person arrested has committed a felony. (Pen. Code, § 836.) ▮ "Reasonable or probable cause exists when the facts and circumstances within the knowledge of the officers at the moment of the arrest are sufficient to warrant a prudent man in believing that the defendant has committed an offense. (Citations.) ▮ The question of probable cause to justify

---

[2] In denying a motion to strike the evidence, the trial judge declared: "I can't get off this approach to the problem: Assuming the arrest was entirely unlawful, the evidence in this case is not the result of any search of the premises or person. The evidence in this case was discovered by the officers from a voluntary display by the defendant when he threw it over the fence."

an arrest without a warrant must be tested by the facts which the record shows were known to the officers at the time the arrest was made.'' (*People* v. *Talley* (1967) 65 Cal.2d 830, 835 [56 Cal.Rptr. 492, 423 P.2d 564].)

▮ The burden of showing reasonable cause rests upon the prosecution. (*People* v. *Shelton, supra,* 60 Cal.2d 740, 744.) ▮ Therefore, where the prosecutor failed to establish the reliability of Priolo and Levine, we must regard them as untested informants. Likewise, where Deputy Hill was not asked whether he heard a window being raised and the tearing of a screen, we are obliged to assume that he knew nothing about Denise Whalen's escape through the window when he decided to enter the house and arrest appellant.

The sufficiency of Deputy Hill's knowledge, at the time when the two officers first arrived, to establish probable cause for an arrest may be questioned for two reasons: (1) None of the informers was of proven reliability. (*People* v. *Talley* (1967) 65 Cal.2d 830, 835-836 [56 Cal.Rptr. 492, 423 P.2d 564]; *People* v. *Prewitt* (1959) 52 Cal.2d 330, 337 [341 P.2d 1].) There was some corroboration of the informants' disclosures (though not as to an incriminating fact) in that the officers identified appellant from a ''mug shot'' and personally observed him entering the house identified by the informants. (2) The stories of the informers did not specifically show that they had reason to believe appellant was currently violating narcotics laws. ''The critical fact is present violation of the law, not past violation.'' (*People* v. *West* (1965) 237 Cal.App.2d 801, 807 [47 Cal.Rptr. 341]; also see *People* v. *Privett* (1961) 55 Cal.2d 698, 702 [12 Cal.Rptr. 874, 361 P.2d 602].) Here the information supplied by Priolo was that he had purchased heroin from appellant four times, never less than three weeks before the arrest. The information that the room in which marijuana had been found three weeks before the arrest was appellant's bedroom was also not contemporaneous. We need not determine whether in these circumstances the information was too stale to justify an arrest, because it was in any event not shown to be reliable. However, this untested information concerning repeated incidents of sale or possession of narcotics was enough to create a suspicion that appellant was continuously and currently violating narcotics laws. Thus the officers were justified in visiting appellant's residence for the purpose of interrogating him. (*People* v. *Michael* (1955) 45 Cal.2d 751, 754 [290 P.2d

852]; *People* v. *Gamboa* (1965) 235 Cal.App.2d 444, 447 [45 Cal.Rptr. 393].)

 It was in the foregoing context of reasonable suspicion that Deputy Hill saw appellant run into the house and slam the door when he recognized Hill and Sanchez as law officers. Appellant's announcement inside the house, ''The law. It's the law,'' established the fact that the occupants were aware that the visitors were plain clothes officers and the loud scuffling and running which ensued showed that the reaction was that of fright and consternation.

Where a suspect merely slams the door shut in the face of investigators after having been informed that they are police officers, there is no probable cause for arrest in the absence of something more. There are many reasons other than guilt of a felony for a suspect to refuse a policeman permission to enter his residence. (*Tompkins* v. *Superior Court* (1963) 59 Cal.2d 65, 68 [27 Cal.Rptr. 889, 378 P.2d 113]; *Lewis* v. *Superior Court* (1964) 226 Cal.App.2d 102 [37 Cal.Rptr. 773].) It is also true that appellant's announcement, ''The law. It's the law'' is not alone enough to provide reasonable cause for an entry and arrest. (*Lewis* v. *Superior Court, supra.*) In *Lewis* there was no evidence of furtive conduct apart from the suspect's slamming the door and saying ''cops.'' Here there was evidence of furtive conduct in appellant's flight into the house, his agitated announcement, and the scuffling and running which ensued. Furtive conduct can substantiate information derived from an untested informant. (*People* v. *Talley, supra,* 65 Cal.2d 830, 836; *People* v. *Landry* (1964) 230 Cal.App.2d 775, 780 [41 Cal.Rptr. 202].)

In the *Landry* case, the police interrogated a girl who appeared to be under the influence of narcotics. She explained that she had spent the evening at defendant's apartment. Officers went to the apartment with the girl, and defendant opened the door in response to the girl's knock. When he observed that there were uniformed officers present, he uttered an obscene comment about the ''cops'' and dashed back into the room, leaving the door open. Believing that the suspect was attempting to destroy narcotics, the officers entered and followed him into the bathroom where he threw marijuana out of the window. The court held that ''defendant's furtive actions in rushing back into the apartment, coupled with his derogatory remarks about the police, implied guilt of some sort to one of the police officers; the girl's information that she had spent the evening in the apartment and the officer's

belief that she had secured narcotics there combined to provide substantial corroboration to justify the officer's conclusion that defendant was rushing back into the apartment for the purpose of disposing of any narcotics that might remain. With these thoughts in mind it was reasonable for the officer to enter the apartment.'' (230 Cal.App.2d at 780.)

The present case differs from *Landry* in that here the informers' stories did not relate an event in the immediate past. ██ However, there is no rigid formula for probable cause, and information from diverse sources may in sum amount to probable cause though no single item of information meets the test. (*People* v. *Gamboa, supra,* 235 Cal.App.2d 444, 448.) Appellant's reaction to the arrival of the officers caused Deputy Hill reasonably to believe that illicit activity was being carried on in the house. The previously acquired information told Deputy Hill what the activity was, and his experience as a narcotics officer warned him that unless he made an immediate arrest and search the contraband would be destroyed. We hold that Deputy Hill was justified in believing appellant was guilty of possessing narcotics. ██ Therefore, the evidence seized in the search incidental to the arrest was admissible.

The judgment is affirmed.

Devine, P. J., concurred.

RATTIGAN, J.—I dissent. I do not agree that Deputy Hill, at the moment he kicked the door open, had reasonable cause to make an arrest inside the house, because I do not agree that he had reasonable cause to believe, at that moment, that there were narcotics in appellant's possession on the premises.

Until the moment he kicked the door open, Deputy Hill had no knowledge of any specific *prior* crime in which appellant was implicated. Therefore, this was not a case where entry was justified because the officer had reasonable cause to believe (Pen. Code, § 836, subd. 3) that a person within the premises was guilty of a felony committed previously and elsewhere. (Cf. *People* v. *Talley* (1967) 65 Cal.2d 830, 834-837 [56 Cal.Rptr. 492, 423 P.2d 564]; *People* v. *Phillips* (1966) 240 Cal.App.2d 197, 203 [49 Cal.Rptr. 480]; *People* v. *Harris* (1964) 231 Cal.App.2d 214, 217-218 [41 Cal.Rptr. 642].) In this case, Hill could validly arrest appellant—and enter the premises to do it—if he had reasonable cause to believe that

appellant had committed a public offense in the officer's presence (Pen. Code, § 836, subd. 1) or to believe that appellant had committed a felony (*id.*, subd. 3) ; but, in either case, only if he had such reasonable cause as to a crime committed on the scene and contemporaneous with the arrest.

In the context of fact, such crime was necessarily the possession of narcotics, because it could have been nothing else. Therefore, Deputy Hill could not have had reasonable cause to arrest for possession unless he could reasonably have concluded from all the circumstances *that there were narcotics in the house.* According to his testimony[1] this was his conclusion. In my opinion, his conclusion was unreasonable, under

[1]Deputy Hill's testimony concerning his decision to enter the house was elicited during his direct examination. The subject was discussed in his cross-examination. On direct, he testified as follows:

" . . . . . . . . . . .

"A. As I arrived at the back door, I observed the Defendant just entering the house, I exited from the vehicle, yelled, 'Sheriff's Department,' and approximately at the same general time the Defendant slammed the back door.

"Q. When you say 'slammed the back door,' did he slam it while standing outside or had he gone through the door?

"A. He had gone through the door and he was on the inside of the house.

"Q. All right.

"A. I heard someone say, 'It's the law. The law is here.' And then there was some loud scuffling noise from the house.

"Q. What happened next?

"A. Deputy Sanchez ran to the back door, and at that time I ran to the front door. Inasmuch as *I believed the Defendant to be attempting to get rid of narcotic evidence——*

"Q. Wait just a moment. Did you have an opinion or form an opinion as to what was taking place in the house?

"A. Yes.

"Q. What was that?

"A. *My opinion was that he was attempting to destroy narcotic evidence.*

"Q. What evidence or what activity did you base that belief on?

"A. *Because of his furtive actions and because of the fact that he yelled, 'The law is here.'*

"Q. And in your experience in narcotics, if narcotics are [*sic*] in the house, how would they be disposed of if that were to be done?

"A. Flushed down the toilet.

"Q. And in the investigation of narcotics, if narcotics are flushed down the toilet, is there a way to recover them after they go through the toilet stool?

"A. No.

"Q. Is this a common or uncommon method of disposing of narcotics material?

"A. Common.

"Q. And what caused you to believe that he was attempting to destroy or have someone else destroy the narcotic material?

"A. *Because of the fact that he ran in the house, slammed the door, made the statement, 'The law is here.'* " (Italics added.)

the circumstances known to him at the moment he kicked the door open.

The circumstances known to Deputy Hill at that time derived from the informants' disclosures, from the investigation of appellant's criminal record, and from what he saw and heard at the house before he entered it.

*The informants' disclosures* did not reasonably warrant Deputy Hill's conclusion that there were narcotics in appellant's possession inside the house. If narcotics were there, they were either there — in the *house* — before appellant entered, or he carried them inside *upon his person* when he ran through the back door. The only information associating *the house* with narcotics had come from the informants Priolo and Levine. Their joint disclosure identified the location where marijuana had been seized on January 7 as appellant's bedroom : but it went no further.

No informant attributed possession of the marijuana, or knowledge of its location or of its existence, to appellant. No informant placed appellant in the bedroom, or even in the house, at or near the time the marijuana was found in the bedroom. No informant said that appellant actually lived in the residence, at least in the sense that he was frequently there. No informant suggested any pattern of behavior on appellant's part, any recurrent activity, any course of conduct, from which Deputy Hill might have concluded that narcotics would have reappeared on the premises after the seizure on January 7. Absent such information, and since we may assume that the January 7 search swept the house clean, I do not believe that the presence of marijuana on that date gave Deputy Hill reasonable cause to believe that contraband was *in the house* three weeks later.

Deputy Hill might have reasonably concluded that narcotics were in the house on February 1 if he had reason to believe that appellant was carrying them *on his person* when he fled from the officers. The informants' disclosures, however, did not reasonably warrant such belief. As the majority opinion points out, the stories did not show that the informants had reason to believe appellant was currently violating narcotics laws. Only Priolo disclosed anything regarding possible criminal activity by appellant; but (and disregarding the absence of reliability in himself or of timeliness in his disclosure) nothing he said in this regard supported the belief that appellant had narcotics on his person—or, hence, in the house—on February 1.

And *the investigation* by the officers—if it can be called that—did not reasonably warrant such belief. During the three weeks which followed the interview of Priolo and Levine, a police surveillance of the premises at 4549 Lomina Street might have improved the officers' information concerning the prospect of narcotics at the address; but the record shows that none was undertaken. Nothing, in fact, occurred during that period except that Deputy Sanchez looked for, and apparently found, that appellant had a criminal record. Since its contents were not disclosed to the trial court, the record added nothing to suggest that narcotics were in the residence, or entered it on appellant's person, on February 1.

If, then, there was reasonable cause to believe that narcotics were in the house on February 1, it had to develop from Deputy Hill's observations when he arrived. The majority opinion concludes that Hill's observations established reasonable cause to arrest because they crystallized his prior information. Hill himself based his critical decison to enter the house *exclusively* upon his observations, and disregarded his prior information: this, at least, is the fair import of his testimony on the subject. (See emphasized answers, footnote 1, *supra.*) By anyone's estimate, what he saw and heard included "furtive conduct." Again, however, I cite the recurrent theme that what he saw and heard did not reasonably warrant the conclusion that appellant was *in possession of narcotics inside the house.*

It is not to be disputed that furtive conduct by a suspect will contribute to reasonable cause for his arrest. The question here, though, is whether appellant's conduct contributed to reasonable cause to arrest for *possession of narcotics* at the time. Thus, we may immediately distinguish such cases as *People* v. *Talley, supra,* 65 Cal.2d 830, where the officer was looking for the perpetrator of an offense already committed and the suspect's furtive conduct led the officer to believe that he had found his man. In another array of cases, as here, the question was whether the suspect was in possession of contraband; but the "furtive conduct" was *itself* indicative of possession because the suspect attempted to discard, conceal or destroy something in the arresting officer's presence.[2] In

---

[2] E.g., where the suspect, in flight from police officers, attempted to discard contraband (*People* v. *Currier* (1965) 232 Cal.App.2d 103, 107 [42 Cal.Rptr. 562]; *People* v. *Williams* (1963) 220 Cal.App.2d 108, 112-113 [33 Cal.Rptr. 765]; *People* v. *Barquera* (1962) 207 Cal.App.2d 725, 728 [24 Cal.Rptr. 675]; *People* v. *McMurray* (1959) 171 Cal.App.2d 178, 185 [340 P.2d 335]; *People* v. *Cisneros* (1958) 166 Cal.App.2d 100, 102

other cases, the suspect's visible attempt to conceal possession was held to contribute to reasonable cause for his arrest because it corroborated information previously received from informants or similar prior sources.[3]

The last mentioned category of cases—those in which a suspect's conduct corroborated prior information which had generated some reason to believe that contraband was present —includes *People* v. *Landry* (1964) 230 Cal.App.2d 775 [41 Cal.Rptr. 202], cited and relied upon in the majority opinion. In the *Landry* case, the officers entered an apartment to arrest the occupant after he referred to "cops" and ran to the bathroom from the apartment door. The officers had been led to the apartment by a girl who was freshly under the influence of narcotics and who told them she had spent the evening there.

The majority opinion observes that the present case differs from *Landry* "in that the informers' stories did not relate to an event in the immediate past." I agree, but I consider the difference to be decisive. In *Landry,* the officers' information concerning "an event in the immediate past" reasonably warranted the belief that narcotics were in the apartment, which belief was in turn corroborated by the suspect's furtive conduct. In the case before us, with no information at all concerning an immediately past event, appellant's furtive conduct corroborated nothing. It seems to me that the *Landry* decision is, thus, wholly distinguishable on its facts.

[332 P.2d 376]); where his possession was reasonably inferred when contraband was found in the fresh tracks of his flight (*People* v. *Hilliard* (1963) 221 Cal.App.2d 719, 723-724 [34 Cal.Rptr. 809]; *People* v. *Anderson* (1962) 199 Cal.App.2d 510, 513, 515 [18 Cal.Rptr. 793]); or where, not fleeing, the suspect made a visible gesture, indicative of possession and held sufficient in itself to constitute reasonable cause for his arrest for possession. (*People* v. *Nailor* (1966) 240 Cal.App.2d 489, 493 [49 Cal.Rptr. 616]; *People* v. *Mora* (1965) 238 Cal.App.2d 1, 3 [47 Cal.Rptr. 338]; *People* v. *Tabb* (1962) 208 Cal.App.2d 567, 570-571 [25 Cal.Rptr. 541].)

[3]E.g., *People* v. *Diaz* (1965) 238 Cal.App.2d 636, 638-639 [48 Cal.Rptr. 20]; *People* v. *Ausbie* (1965) 232 Cal.App.2d 724, 727 [43 Cal.Rptr. 137]; *People* v. *Acosta* (1963) 213 Cal.App.2d 706, 710 [29 Cal.Rptr. 241]; *People* v. *Vegazo* (1961) 191 Cal.App.2d 666, 668 [13 Cal.Rptr. 22]. In the *Vegazo* case, the suspect crumpled a marijuana cigarette when the officer entered the room. The court keynoted this category of cases in stating (191 Cal.App.2d at p. 671): ". . . the arrest could not properly be sanctioned by information supplied by an informant who has not been proven reliable. But the information did not stand alone. The observation by the police of an act that furtively attempted the concealment or destruction of the contraband *coalesced with, and in a sense corroborated,* the information." (Italics added. See, also, cases cited in *Vegazo,* with summaries of suspects' conduct, 191 Cal.App.2d at pp. 669-671.)

In the *Landry* decision, also, Mr. Justice Burke (then Presiding Justice of the *Landry* court) made this observation (230 Cal.App.2d at pp. 779-780) : "Thus, the occurrences at the door of defendant's apartment become crucial on the issue of probable cause. Had the defendant merely opened the door, observed the officers and slammed the door shut, it might well be contended *that probable cause for entry was still lacking and that a forcible entry would have been unjustified. (Tompkins* v. *Superior Court, supra,* 59 Cal.2d 65, 67; *Lewis* v. *Superior Court,* 226 Cal.App.2d 102, 104 [37 Cal.Rptr. 773] ; *People* v. *Cedeno, supra,* 218 Cal.App.2d 213 [32 Cal.Rptr. 246].) From the obscene remark, its intonation, and the reference to the officers, after defendant had stepped out into the open doorway, it was made quite apparent *that he saw the officers and wanted no transactions with them; had he simply so indicated and shut the door, a forcible entry would not have been justified under the cases cited above.*" (Italics added.) In the instant case, in my opinion, appellant's conduct in Deputy Hill's presence was closer to the actions suggested in the quoted hypothesis—as not justifying a forcible entry—than to what the *Landry* suspect actually did.

I agree with the majority that the statement "It's the law. The law is here," considered alone, would not justify entry and arrest. I cannot find in the remark, either, any reasonable cause to believe that there were narcotics *present.* (Compare remarks indicating presence of contraband in, e.g., *People* v. *Garcia* (1965) 239 Cal.App.2d 58, 59 [48 Cal.Rptr. 305] ["It's the police; flush the stuff."] ; *People* v. *Jefferson* (1964) 230 Cal.App.2d 151, 152 [40 Cal.Rptr. 715] ["Get rid of the stuff."] ; *People* v. *Verrette* (1964) 224 Cal.App.2d 638, 640 [36 Cal.Rptr. 819] ["Ester, the cops, destroy."] ; and see *Lewis* v. *Superior Court* (1964) 226 Cal.App.2d 102, 103, 104 [37 Cal.Rptr. 773] ["Cops!"], cited in the majority opinion.)

Deputy Hill also heard "some loud scuffling noise from the house." If the "scuffling" noise contributed to his decision to break into the house, he did not so testify. (See emphasized answers, footnote 1, *supra.*) Again, I do not find, in the noise, any reasonable cause to believe that there were narcotics in appellant's *possession.*[4] Deputy Hill properly recognized that

---

[4]The time sequence persuades me that the "scuffling" noise heard by both officers was associated with the imminent—and noisy— departure of Denise Whalen through a window, where she was intercepted by Deputy

narcotics could be quickly and irretrievably disposed of through a toilet. But a ''scuffling'' noise does not so point to the disposal of contraband, through a plumbing outlet, as to indicate the *presence* of contraband. In the various decisions holding that the imminent use of plumbing contributed to reasonable cause to enter and arrest on narcotics charges. it appears that the officers had some prior reason to believe that narcotics were present; or that the suspect actually used, or attempted to use, plumbing fixtures; or both.[5]

The Attorney General notes that Deputy Hill, in forcibly entering the house to make an arrest, did not comply with the statutory requirement that he first demand admittance and explain his purpose. (Pen. Code, § 844.) It is argued, on the authority of *People* v. *Maddox* (1956) 46 Cal.2d 301 [294 P.2d 6], that noncompliance—and the entry itself—were justified because of the prospect that evidence would be destroyed inside the house.

The *Maddox* rule is not to be disputed: but in *Maddox* and in all the cases following it the noncomplying officer had reasonable cause to believe, before he entered the premises, *that evidence was in fact inside. (People* v. *Maddox, supra,* 46 Cal.2d at p. 303 [visitor had received narcotics injection on the premises minutes before the officers entered when occupant did not respond to their knock]; see also, e.g., *People* v. *King* (1965) 234 Cal.App.2d 423, 433 [44 Cal.Rptr. 500]; *People* v. *Aguilar* (1965) 232 Cal.App.2d 173, 177 [42 Cal. Rptr. 666]; and see *People* v. *Arellano* (1966) 239 Cal.App.2d 389, 392-393 [48 Cal.Rptr. 686].) Consequently, these cases, in my view, do not support respondent's position on reasonable cause to arrest: an officer does not have reasonable cause to

---

Sanchez. I agree with the majority, however, that Deputy Hill knew nothing of the Whalen woman's exit when he decided to enter the house and arrest appellant, so that her actions did not contribute to reasonable cause for his entry. The trail court apparently shared the same conclusion, as is indicated by the following remarks exchanged during argument concerning admission of the evidence in question:

''[Appellant's counsel]: Well, of course, Officer Hill kicked the front door in without knowing that the woman had come out the side window. He was around in front of the house and he kicked the front door in and he was on the inside at that time.

''THE COURT: I think that is correct.''

[5]E.g., *People* v. *Fuqua* (1963) 222 Cal.App.2d 306, 311 [35 Cal.Rptr. 163]; *People* v. *Ruiz* (1961) 196 Cal.App.2d 695, 700-701 [16 Cal.Rptr. 855]; *People* v. *Fisher* (1960) 184 Cal.App.2d 308, 315 [7 Cal.Rptr. 461]; *People* v. *Hurst* (1960) 183 Cal.App.2d 379, 385-386 [6 Cal.Rptr. 483]; *People* v. *Williams* (1959) 175 Cal.App.2d 774, 776 [1 Cal.Rptr. 44]; *People* v. *Merino* (1957) 151 Cal.App.2d 594, 596-597 [312 P.2d 48].

anticipate the destruction of evidence unless he has reasonable cause to suspect *its presence*.

I have concluded that Deputy Hill did not have reasonable cause to arrest appellant, and to enter the house by force to do it, *because nothing the officer knew or saw or heard reasonably warranted the belief that narcotics were in appellant's possession inside the house*. If Deputy Hill did not have reasonable cause to arrest, the entry was unlawful. (*People* v. *Pereda* (1964) 229 Cal.App.2d 814, 816-819 [40 Cal.Rptr. 566]; *Lewis* v. *Superior Court, supra,* 226 Cal.App.2d 102, 104; *Hood* v. *Superior Court* (1963) 220 Cal.App.2d 242, 247 [33 Cal.Rptr. 782]; *People* v. *Cedeno* (1963) 218 Cal.App.2d 213, 226-227 [32 Cal.Rptr. 246]; *People* v. *Haven* (1963) 59 Cal.2d 713, 715-718 [31 Cal.Rptr. 47, 381 P.2d 927]; *People* v. *O'Neill* (1960) 187 Cal.App.2d 732, 734 [10 Cal.Rptr. 114]; *People* v. *Thymiakas* (1956) 140 Cal.App.2d 940, 943 [296 P.2d 4].)

In each of the entry cases just cited, the entering officers, in my opinion, had more substantial prior information—of illegal activity in the entered premises—than did Deputy Hill in the instant case; and, in the *Lewis, Hood, Cedeno, O'Neill* and *Thymiakas* cases, the suspect engaged in patently furtive conduct before the entry was made. In the light of these decisions and my evaluation of the evidence, I do not believe that appellant passed beyond the pale of the Fourth Amendment when he ran into his own home.

Apart from my own evaluation of the evidence establishing reasonable cause to make an entry and arrest in this case, I also have in mind the viewpoint from which the trial court evaluated the same evidence. I agree with the majority that evidence obtained in consequence of a suspect's voluntary act is unlawfully seized if the act was the "direct result" of illegal police conduct. I further agree that the trial court, not applying this rule, admitted the incriminating evidence upon the erroneous theory that it was discovered because appellant voluntarily disclosed it without a search. The majority opinion quotes the trial court to this effect, and the judge so expressed himself repeatedly.

I am not suggesting that the trial judge did not understand the rule of reasonable cause to arrest, which he clearly did. Nor am I saying that, if there is a valid reason to have admitted the evidence seized, we should reverse because the trial court's reason was the wrong one. In the light of the judge's candid and reiterated comments, however, I cannot escape the

conclusion that since he weighed the evidence on reasonable cause under an incorrect theory in a close case, he did not weigh it correctly.

I would reverse the judgment.