[Crim. No. 18177. Second Dist., Div. Five. May 25, 1971.]

THE PEOPLE, Plantiff and Respondent, v.
ROBERT HOLLANDER GONZALES, Defendant and Appellant.

## COUNSEL

Richard S. Buckley, Public Defender, James L. McCormick, George S. Barr and Leighton A. Nugent, Deputy Public Defenders, for Defendant and Appellant.

Thomas C. Lynch and Evelle J. Younger, Attorneys General, William E. James, Assistant Attorney General, and Blanche C. Bersch, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**KAUS, P. J.**—Defendant was charged by information with possession of restricted dangerous drugs. (Health & Saf. Code, § 11910.) He pleaded not guilty, and waived his right to confront and cross-examine witnesses, both for purposes of a motion under section 1538.5 of the Penal Code and for purposes of trial. After a motion to suppress was denied, the cause was submitted on the transcript of the preliminary hearing, plus additional testimony by the defendant. Found guilty, the defendant was sentenced to six months in the county jail. Sentence was suspended and defendant was placed on two years' probation. He appeals from the judgment (order granting probation), claiming error in the denial of his motion to suppress evidence. (Pen. Code, § 1538.5, subd. (m).)

### FACTS

On August 7, 1969, Officer Allinson of the Downey Police Department, the People's only witness, received information from an unidentified

citizen[1] regarding possible narcotic activity at 13439 Bixler Street. Allinson was told that vehicles would stop approximately one block from 13439 Bixler, a single occupant would then walk to that address, remain there for one or two minutes, leave and join other persons who had remained in the vehicles. Allinson was further told that people who appeared to be under the influence of alcohol or drugs would be seen staggering in the street and on citizens' lawns in the area. The informant did not connect these persons with the activities at 13439 Bixler.

Following receipt of this information, commencing at about 9:30 p.m. that same day, Allinson, working in conjunction with five other officers, placed the location under surveillance. Allinson observed several people park cars both north and south of 13439 Bixler, about a block away. A single occupant would leave the vehicles, walk to the single family residence at that address, stay one or two minutes and then return to the vehicle.

One of the cars which Allinson observed included among its occupants two persons with whom the officer was "familiar" from prior narcotics arrests. One of these two persons walked to the Bixler Street address and then returned to the car. When the car drove off, Allinson got in touch with two of his fellow officers who stopped it about one half mile from the location. Allinson then met with the officers who showed him three plastic baggies tied with red wire fasteners and containing 25 red capsules resembling secobarbital, which, the officers said, they had confiscated from the occupants of the car.[2]

Allinson resumed his surveillance of the location and again observed vehicles park a block away and a single person walk to the house. Allinson notified a second pair of officers who stopped one such vehicle. Three more plastic baggies, tied with red fasteners and each containing what appeared to be 25 seconal capsules, were confiscated. As a result of stopping the two vehicles a total of eight persons were arrested.

Allinson again resumed surveillance of the location at 11:15 p.m.[3]

---

[1] It appears that the citizen may have lived near where the illegal activity took place since later he was "standing in the front yard" when the officers were surveilling.

[2] Defendant did not, as he could have done (*People* v. *Madden,* 2 Cal.3d 1017, 1021 [88 Cal.Rptr. 171, 471 P.2d 971]; *Remers* v. *Superior Court,* 2 Cal.3d 659, 666-667 [87 Cal.Rptr. 202, 470 P.2d 11]), demand that the officers who made the arrests themselves testify concerning the source of the pills.

[3] Although the officer's testimony is not explicit, it becomes clear upon reading the record that Allinson left the location to meet with fellow officers following the second set of arrests, as he had done following the first arrests; he was shown the confiscated contraband which was recovered as a result of those second arrests; he then returned to the Bixler Street address after a short absence.

He observed a car parked near the front of the residence.[4] Defendant and a female juvenile came out of the residence at 13439 Bixler Street, entered the parked car and drove away. Allinson and his partner followed them to a coffee shop parking lot. As defendant left his car, Allinson identified himself as a police officer and conducted a "pat down" search of defendant. Allinson felt a lumpy object in defendant's left front pocket which he believed was the same size as the baggies he had seen following the earlier arrests that night. He then reached into defendant's pocket and did indeed find a plastic baggie, tied with a red wire fastener and containing 25 secobarbital capsules.[5] Defendant was placed under arrest and his car was searched. A band-aid box containing benzedrine tablets was found under the driver's seat.

Defendant testifying on his own behalf, denied any knowledge of the seconal or of the benzedrine. He offered no explanation for his presence at the Bixler Street address.

## Discussion

The only real issue on appeal is the legality of the seizure of the plastic baggie in defendant's pocket. The record is clear that the only justification for that seizure advanced by the prosecution is the information obtained from the two earlier arrests.[6] If that information was legally obtained, we assume that the information gained from the "citizen" was corroborated with respect to the essential fact that defendant was then violating the law. (*People* v. *Gallegos,* 62 Cal.2d 176, 179 [41 Cal.Rptr. 590, 397 P.2d 174]; *People* v. *Reeves,* 61 Cal.2d 268, 274 [38 Cal.Rptr. 1, 391 P.2d 393].)

■ The People do not concede that the legality of the earlier arrests and their fruits is properly before us. We think that in the rather sophisticated context of this record they are mistaken: the 1538.5 motion was submitted on the transcript of the preliminary hearing. At that hearing the baggies obtained in the earlier arrest were never offered in evidence. Officer Allinson merely testified about them.[7] There was no particular

---

[4]The record is silent with respect to the time when the car had arrived.

[5]The parties stipulated to the chemical nature of the capsules.

[6]Defendant argues that the officers did not even have the right to conduct a pat down for weapons. We need not decide that point, since the People do not claim that without the information obtained as a result of the earlier arrests, the police would have been privileged to reach into defendant's pocket.

[7]There was no objection when he testified about the baggies obtained in the first arrest. When he testified about those obtained in the second arrest the court, at defense counsel's request, limited "the communication from the other officers" to probable cause. This leaves us somewhat in doubt on whether the ruling extended to the information received from the officers who had made the first arrest.

occasion for defense counsel to object to the testimony since he had no way of knowing what other evidence the People would offer. When all the evidence was in and the People offered the contraband found on defendant and in the car, he did object, although he did not advance the specific argument that the arresting officers could not consider what they had learned from the earlier arrests. Later, in the superior court, defense counsel did argue that "if the People contend the result of the search of the occupants of the other vehicles gave the officers probable cause, then the burden is on the People to show that those searches were legal searches and not in violation of the other people's constitutional rights." Earlier, when both parties had submitted the 1538.5 motion on the transcript of the preliminary hearing, the stipulation for submission contained no provision that defendant was to be limited to the precise arguments advanced before the magistrate.[8]

The legality of the earlier arrests is properly before us.[9]

We must assume that the earlier arrests were without a warrant. (*People v. Burke,* 61 Cal.2d 575, 578 [39 Cal.Rptr. 531, 394 P.2d 67].) We must therefore determine whether they were based on probable cause.[10]

---

[8]This situation is distinguishable from that discussed in *People* v. *Adam,* 1 Cal. App.3d 486, 488-489 [81 Cal.Rptr. 738], where we held, following *Giordenello* v. *United States,* 357 U.S. 480, 487-488 [2 L.Ed.2d 1503, 1510-1511, 78 S.Ct. 1245], that where the People merely tried to justify a pat down, they could not argue that the officers really had the right to make an arrest. (Cf. *People* v. *Chimel,* 68 Cal.2d 436, 440-441 [67 Cal.Rptr. 421, 439 P.2d 333].) The distinction lies in the fact that it is the People's burden to justify a warrantless arrest or the intrusion of a pat down. It is the nature of the justification attempted which determines the response called for on the part of the defense and the People may not, under the *Giordenello* rule, advance new legal theories when it is too late for the defense to meet them. This rule does not, however, prevent the defense from arguing new theories why the People's justification is inadequate. Of course, in the case at bar, there would have been no error had the People claimed that they had not anticipated that the defendant would question the illegality of the earlier arrests and had the court permitted them to offer additional evidence.

[9]We assume the continued validity of the rule, first announced in *People* v. *Martin,* 45 Cal.2d 755 [290 P.2d 855], that defendant is entitled to point to the violation of Fourth Amendment rights of others. That rule was recently questioned by a divided court in *Kaplan* v. *Superior Court* *(Cal.App.) 93 Cal.Rptr. 482. The Supreme Court has since granted a hearing in that case and the *Martin* rule thus continues unchanged. (See also *People* v. *Superior Court,* 71 Cal.2d 265 [78 Cal.Rptr. 210, 455 P.2d 146]; *People* v. *Johnson,* 70 Cal.2d 541, 553 [75 Cal.Rptr. 401, 450 P.2d 865].) The Attorney General does not challenge the *Martin* rule in the present proceeding.

[10]We thus ignore a point which, on the pitifully spare record presented, may in itself be fatal to the People: theoretically it is possible that even though the observations at 13439 Bixler Street gave the arresting officers probable cause to arrest anyone

---

*A hearing was granted by the Supreme Court on May 13, 1971. The opinion of that court is reported in 6 Cal.3d 150 [98 Cal.Rptr. 649, 491 P.2d 1].

■ The People claim that the anonymous informer who caused the surveillance was not a "mere informer" but entitled to the status of a "citizen informer" recognized in a series of Court of Appeal decisions and, by dictum, in *People* v. *Hogan,* 71 Cal.2d 888, 890-891 [80 Cal.Rptr. 28, 457 P.2d 868]. (See cases cited in *People* v. *Abbott,* 3 Cal.App.3d 966, 970-971 [84 Cal.Rptr. 40].) So be it, but that does not give the information furnished by him any more probative force than information coming from a so-called reliable or tested informer. In any event there was little that the informer told the officers that they themselves did not observe.[11]

What the officers knew was that on that particular night[12] a number of automobiles had called at 13439 Bixler, that the conduct of occupants followed a certain pattern and that as far as two of them were concerned, the officers had made their acquaintance in some unexplained capacity on the occasion of earlier narcotics arrests.

Manifestly this information was inadequate to give a surveilling officer probable cause to believe that any particular caller at the residence, or any particular person riding in the same vehicle as the caller, had committed a felony. In *People* v. *Pereda,* 229 Cal.App.2d 814 [40 Cal.Rptr. 566], the Long Beach police had information from the Orange County sheriff's office that one Betty Garcia, a narcotics offender then free on bail, had moved to a Long Beach motel, had five ounces of heroin then in her possession and was dealing in narcotics from the motel. The officers then kept the apartment under surveillance for three days. Their observations were summarized by the court as follows: ". . . [T]he officers had determined that a female matching the description of the woman report-

---

who had called at that address and, in addition, anyone else in the car, the baggies were nevertheless illegally seized. At least two possibilities, both perhaps farfetched, come to mind: first we have no idea where the occupants of the two cars were arrested. If they had gained the relative sanctuary of a home, the seizure of the baggies could have been effected in violation of section 844 of the Penal Code or the rule of *Chimel* v. *California,* 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034], or both. Second, again because the record is a blank, the immediate circumstances of the seizure could have been violative of due process under the rule of *Rochin* v. *California,* 342 U.S. 165 [96 L.Ed. 183, 72 S.Ct. 205, 25 A.L.R.2d 1396]. This is all, admittedly, idle speculation.

[11]The only information not corroborated during the surveillance was the presence of staggering persons in the vicinity. Since that happens in many neighborhoods and the persons were never connected to 13439 Bixler, that part of the informer's observations seems very insignificant.

[12]Nothing in the record suggests that the informer's information covered a greater time span: "I was contacted by a citizen regarding several vehicles stopping approximately a block away from the location. One of the occupants of the vehicle getting out, walking up to the address at 13439 Bixler, staying for approximately one to two minutes and then leaving the residence, joining other people in the vehicle approximately a block away from the residence."

edly engaged in the illegal activity was occupying an apartment in the 1700 block of East Ocean Boulevard, as the information had indicated; that she was living there with two other persons; that some telephone messages to the apartment came from Tijuana, Mexico. (The officers theorized that defendants were part of a narcotics ring smuggling narcotics to the United States from Mexico.) The officers observed that the occupants of apartment 49 kept the blinds of their apartment drawn and were seen to look out on occasion when someone passed by. The officers saw Miss Garcia drop two paper napkins outside of the apartment which one of the officers thought had been used to wipe off a spoon, heated during preparation for the taking of a narcotic injection. One person of Mexican extraction was seen to enter the apartment, leave after remaining approximately five minutes and get into a car containing three other persons. All four had narcotic records. One other person of Mexican extraction was refused admittance to the apartment. Defendant was then seen to enter the apartment after arriving from a bus depot, stay approximately two hours and then be driven, by one of the occupants of the apartment, back to the bus depot, where his arrest then took place. . . ." (*People* v. *Pereda, supra,* 229 Cal.App.2d at p. 819.)

Although these facts are immeasurably stronger than those disclosed by the record here, the court held nevertheless that the observations did not constitute "circumstantial corroboration of the essential fact as to whether these persons were then violating the law."

It is, of course, entirely possible that after the officers who effected the earlier arrests started to follow the two automobiles they learned additional facts on which a legal arrest could be based. The record, however, is silent.

Since the showing that the earlier arrests were justified by the observations at the scene was inadequate, it was impermissible for the officer who arrested defendant to conclude that the object in defendant's pocket which was obviously not a weapon (see *People* v. *Collins,* 1 Cal.3d 658, 663 [83 Cal.Rptr. 179, 463 P.2d 403]), was contraband.[13]

The trouble with this case is not that it appears incontrovertibly that

---

[13]It follows from what we have said about the justification for the earlier arrests, that without the knowledge gained from them, there was no probable cause to arrest defendant; in fact his conduct did not even conform to the pattern of the other visitors. As far as the record shows his automobile may have been parked in front of the house during the entire surveillance. Further, the fact that he and his companion emerged together from the premises argues strongly that, whatever reason they had had for being inside, it was not the same as that of the other visitors.

defendant was illegally arrested and searched. It is, rather, that the prosecution was overeager in accepting defendant's apparent accommodation in submitting the matter on an inadequate record.

The judgment (order granting probation) is reversed.

Stephens, J., and Aiso, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied July 21, 1971.