STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v.
HENRY McNAIR, DEFENDANT-RESPONDENT.

Argued November 23, 1971—Decided January 17, 1972.

*Mr. David S. Baime,* Assistant Prosecutor, argued the cause for appellant (*Mr. Joseph P. Lordi,* Essex County Prosecutor, attorney).

*Mr. Peter S. Valentine* argued the cause for respondent (*Mr. Edward F. Zampella,* attorney).

The opinion of the Court was delivered by

JACOBS, J.  The defendant was convicted in 1970 on evidence that he illegally possessed a total of 1010 glassine envelopes and capsules containing heroin at the store premises located at 98 South Orange Avenue, Newark. He did not move for a new trial and is barred under *R.* 2:10–1 from questioning the weight of the evidence; however, we have reviewed the transcript of the trial and find that the

State's evidence was compelling and established the defendant's guilt beyond reasonable doubt. He was sentenced as a second offender to State Prison for not less than 15 nor more than 20 years plus a fine of $2,000. His earlier narcotics conviction was in 1958 and was grounded on evidence that he possessed 51 decks of heroin and was undoubtedly "a distributor" of the drug. See *State v. McNair,* 59 *N. J. Super.* 453, 457 (*App. Div.* 1960), *cert. denied,* 365 *U. S.* 829, 81 S. Ct. 715, 5 *L. Ed.* 2d 706 (1961). At that time, and in the light of his earlier criminal record (59 *N. J. Super.* at 457), he was sentenced to State Prison for 10 to 12 years plus a fine of $1,000. 59 *N. J. Super.* at 455.

The defendant appealed his 1970 conviction to the Appellate Division which, in an unreported *per curiam,* properly rejected his attack on the weight of the evidence and expressed the view, with which we agree, that if the conviction is valid the sentence should not be disturbed. However, it accepted the defendant's attack on the validity of the search which resulted in the seizure of the heroin. It held that a motion by the defendant to suppress the evidence had been improperly denied by the trial court and it accordingly reversed the defendant's conviction. We granted certification on the State's application. 58 *N. J.* 329 (1971).

The store at 98 South Orange Avenue was described as a confectionery and shoeshine parlor. However, it had no exterior signs or names and its confectionery and shoeshine operations were evidently not substantial. Its nominal owner was a young niece of the defendant, but at the time of the search and seizure she had another job and had little or nothing to do with the conduct of the store. Detectives Gockeler and Jackson of the Newark narcotics squad had the store under surveillance because of the defendant's connection with it. Gockeler stated that he saw the defendant (generally called "Pops" (see 59 *N. J. Super.* at 457)) on various occasions behind the counter in the store, that he saw him on one occasion ringing the cash register, and that the store is known as Pops'.

During the surveillance the detectives had received information that the defendant "was selling dope but not from the store." However, on June 5, 1969, Gockeler and Jackson were riding in their unmarked police car when they met one of their paid informers who told them that Pops was selling narcotics from the store. They headed towards it, parking nearby. Shortly thereafter they saw Pops leaning over and talking to someone in a car parked in front of the store. Gockeler recognized the person Pops was talking to as a registered narcotics addict. At that point the detectives started driving towards the store.

According to Gockeler's testimony, which was fully credited by the trial court, Pops knew that Gockeler and Jackson were police officers and as soon as he saw their car coming towards him he went "hurriedly" into the store, apparently almost in a run. The detectives left their car and went after Pops as fast as they could. As they entered the store they saw Pops and no one else inside. As Gockeler described it, "the store has three rooms" and the defendant "was in the second room coming out of what looked like a doorway on the left." While Gockeler was entering the second room he noted an open brown bag on the floor. He picked it up and found that it contained 26 "glassine envelopes with a white powder." From his training and experience he concluded that the white powder was heroin and this was later confirmed by chemical analysis. At that juncture Gockeler formally told the defendant that he was under arrest and that the store was going to be searched.

While Jackson took the defendant into custody, Gockeler searched the middle room and found some "empty glassine envelopes and a .32 caliber colt automatic and holster" on a shelf under a counter top. He then went to the rear and searched what he guessed was "the stockroom" which contained little other than "a locked closet." He located the key and opened the closet finding "a large plastic bowl which contained thirty-one stacks of glassine envelopes." He testified that there were "fifteen envelopes in each stack for a

total of four hundred sixty-five envelopes." He also found a brown bag containing 335 loose glassine envelopes and a green box which was lettered "gelatin capsules." There were 184 capsules in the box and they, along with the glassine envelopes, contained a white powder later identified as heroin.

The fourth amendment does not prohibit all searches but only those that are unreasonable. See *State v. Boykins,* 50 *N. J.* 73, 78 (1967); *State v. Mark,* 46 *N. J.* 262, 275 (1966). Whether a search is reasonable will turn on the particular facts presented and whether information given to the police justifies a particular search may, as here, turn on suspicious and furtive conduct which serves to corroborate the information. See *United States v. Rubio,* 404 *F. 2d* 678, 681 (7 *Cir.* 1968), *cert. denied,* 394 *U. S.* 993, 89 S. Ct. 1482, 22 *L. Ed. 2d* 770 (1969); *United States v. Soyka,* 394 *F. 2d* 443, 453–454 (2 *Cir.* 1968), *cert. denied,* 393 *U. S.* 1095, 89 *S. Ct.* 883, 21 *L. Ed. 2d* 785 (1969); *People v. Satterfield,* 252 *Cal. App. 2d* 270, 60 *Cal. Rptr.* 733 (1967); *People v. Landry,* 230 *Cal. App. 2d* 775, 41 *Cal. Rptr.* 202 (1964); *People v. Vegazo,* 191 *Cal. App. 2d* 666, 13 *Cal. Rptr.* 22, 24–26 (1961); *State v. Boswell,* 115 *N. J. Super.* 253 (*App. Div.* 1971); *State v. Royal,* 115 *N. J. Super.* 439 (*App. Div.* 1971).

In *Vegazo* it was noted that when a person approached by an officer "engages in furtive conduct" the officer may well be justified in making a search and arrest "in view of the officer's prior information and his knowledge of the person's background." 13 *Cal. Rptr.* at 25; *People v. McMurray,* 171 *Cal. App. 2d* 178, 340 *P. 2d* 335, 339–340 (1959). See *State v. Boykins, supra,* 50 *N. J.* at 80; *State v. Boswell, supra,* 115 *N. J. Super.* at 257; *State v. Royal, supra,* 115 *N. J. Super.* at 441–442. In *Satterfield* officers who had been informed that the defendant was selling heroin went to his home intending to talk to him about his "purported activities in narcotics." As their car entered his driveway the defendant saw them and ran into the house.

The officers then heard some scuffling and running and a window screen being ripped. They entered the house and found heroin along with other incriminating articles. In holding that the seized material was properly received in evidence the court stressed the furtive conduct which, it pointed out, "can substantiate information derived from an untested informant." 60 *Cal. Rptr.* at 738. See *People v. Talley,* 65 *Cal.* 2d 830, 56 *Cal. Rptr.* 492, 423 *P.* 2d 564, 569 (*Sup. Ct.* 1967).

In *Soyka* a federal narcotics agent was informed that the defendant was selling heroin from his apartment. The agent, in the company of other officers, went to the apartment building for the avowed purpose of verifying the location and description of the defendant's apartment preparatory to obtaining a search warrant. As they approached the fifth floor, the door to Soyka's apartment opened and as Soyka saw the officers he "jumped back toward the inner recess of the apartment." He was arrested and during a search heroin was found. In sustaining the arrest and search Judge Friendly made the following comments:

All that the informant had said was reinforced by what Soyka did, and what Soyka did was colored by what the informant had said. Reading the Fourth Amendment as requiring a law enforcement officer, armed with the reasons for belief in guilt that Agent Waters possessed, to allow a suspect to retire and destroy the evidence of his crime, would ignore that only 'unreasonable' searches and seizures are banned. Cf. United States v. Nicholas, 319 F. 2d 697 (2 Cir.), cert. denied, 375 U. S. 933, 84 S. Ct. 337, 11 L. Ed. 2d 265 (1963). 394 *F.* 2d at 454.

In *Rubio* several narcotics agents went to an apartment to arrest two men who had made narcotics sales to federal agents. They arrested the men and while at the apartment they saw Rubio, clad in undershorts and a T-shirt, trying to leave the apartment through a bedroom window. They arrested him and searched a vanity case in his possession, finding cash and narcotics. In sustaining the arrest and search, the Seventh Circuit cited *Soyka* with approval and said:

A probable cause conclusion may be drawn from the gestalt which a factual situation presents; that is, such a conclusion may be deducted from the separate facts as they interrelate, even though such a conclusion could not be reached if the separate facts were evaluated on an individual basis. Here, Rubio's flight, his presence in the abode of known drug vendors, the mode of his dress (or undress), and his vanity case are individual facts which, if analyzed without reference to the surrounding circumstances, may be ambiguous and thus, even though cumulated, would not be a justifiable basis for Rubio's arrest. This individual factual analysis is not only unrealistic, but is also contrary to the *Beck* rule which mandates a totality-of-circumstances inquiry. Employing this test to the facts in the instant case, we hold that the agent had reasonable grounds to believe that a narcotics violation was being committed when Rubio was arrested. Consequently, the narcotics found in Rubio's case were seized as the result of a legal search incident to a valid arrest. 404 *F.* 2*d* at 681.

Recent decisions in our own courts have sympathetically applied the principles expressed in the cited cases. See *State v. Royal, supra,* 115 *N. J. Super.* 439; *State v. Boswell, supra,* 115 *N. J. Super.* 253; *cf. State v. Boykins, supra,* 50 *N. J.* at 77–78. In *Royal* a member of Newark's narcotics squad received a telephone call informing him that narcotics were being used at 51 Howard Street. He, along with other officers, went to the address to make inquiry. One of the officers knocked on the door and told the occupants that it was the police. At that juncture two or three individuals ran out the back of the house and fled over a fence. The defendant, partially clad, ran through the front hallway and upstairs. One of the officers chased the defendant into a bedroom and discovered glassine bags of heroin which the defendant was apparently trying to destroy. In holding that the search and contemporaneous arrest (*cf. State v. Doyle,* 42 *N. J.* 334, 342–345 (1964)) were lawful, the Appellate Division stressed the defendant's furtive conduct; it noted that in view thereof the officers were justified in following him and, in following him, they were led directly to the contraband which was properly received in evidence. 115 *N. J. Super.* at 442. Similarly in *Boswell* the officers had information that narcotics were being sold at 416 South Ninth Street. They went there and

confronted the defendant who thereupon tried to escape. The Appellate Division held that "such conduct, combined with all the pre-existing information obtained by or known to the police," authorized the police to pursue, arrest and search. 115 *N. J. Super.* at 257.

Fairly applying all of the foregoing to the particular circumstances at hand, the search by Gockeler must be deemed reasonable. He and his co-officer were aware of the defendant's prior conviction for a narcotics offense (*cf. United States v. Harris,* 403 *U. S.* 573, 91 S. Ct. 2075, 29 *L. Ed. 2d* 723, 733 (1971)) and had been informed that he was selling dope. They suspected that the store at 98 South Orange Avenue was being used in that connection and placed it under surveillance but it was not until June 5 that they were informed that the defendant was actually selling dope from the store. They immediately went there for the purpose of further surveillance and at that point they saw the defendant talking to an addict. The defendant knew that Gockeler and Jackson were officers and when he saw them he rushed into the store. The officers had no time to seek a warrant for by then the heroin would have disappeared. The totality of the circumstances, including the defendant's furtive conduct, gave them probable cause for believing that the defendant had narcotics in the store and was engaging in their illegal sale and distribution. They properly pursued him into the open store and when Gockeler saw the defendant coming from a doorway into the second room and noticed the open brown bag on the floor, he suspected that it contained narcotics. In picking it up and examining it he did nothing unreasonable and after ascertaining its contents he lawfully placed the defendant under formal arrest. See *State v. Mark, supra,* 46 *N. J.* at 269–271.

In supporting its view that Gockeler had no right to ascertain the contents of the open brown bag on the floor, the Appellate Division stressed that the second room was a "non-public" portion of the store premises. One of the de-

fendant's witnesses did state that the second room was private but he also stated that it was used in connection with the replenishment of supplies and by those who had occasion to avail themselves of the store's lavatory. However, we need not determine whether the second room was or was not technically part of the store premises open to the public for, in either event, the search therein by Gockeler was reasonable. See *State v. Royal, supra,* 115 *N. J. Super.* 439; *State v. Boswell, supra,* 115 *N. J. Super.* 253; *United States v. Soyka, supra,* 394 *F. 2d* 443; *United States v. Rubio, supra,* 404 *F. 2d* 678; *People v. Satterfield, supra,* 252 *Cal. App. 2d* 270, 60 *Cal. Rptr.* 733.

▇ The defendant, citing *Chimel v. California,* 395 *U. S.* 752, 89 S. Ct. 2034, 23 *L. Ed. 2d* 685 (1969), *Preston v. United States,* 376 *U. S.* 364, 84 S. Ct. 881, 11 *L. Ed. 2d* 777 (1964), and *Agnello v. United States,* 269 *U. S.* 20, 46 S. Ct. 4, 70 *L. Ed.* 145 (1925), contends that at least the search of the locked closet was outside "the bounds of propriety." The defendant's conviction may stand on the basis of the heroin found in the second room without regard to the propriety of the additional search; furthermore, we find that the search of the locked closet was reasonably incident to the contemporaneous arrest and was not unlawful. In *Preston* and *Agnello* the search was not at the time of the arrest and in its *"immediate* vicinity" (*Vale v. Louisiana,* 399 *U. S.* 30, 33, 90 S. Ct. 1969, 26 *L. Ed. 2d* 409, 413 (1970)) but was remote from the time and place of arrest. In *Chimel* the search was a general exploratory one in the defendant's dwelling where he had been arrested on a burglary charge. Whether *Chimel* would be extended to the search of store premises is not free from doubt (*cf. State v. Carter,* 54 *N. J.* 436, 449 (1969), *cert. denied,* 397 *U. S.* 984, 90 S. Ct. 969, 25 *L. Ed. 2d* 130 (1970)); in any event, *Chimel,* which had the effect of narrowing the permissible scope of a search incident to an arrest, was decided on June 23, 1969 and has no retroactive effect. See *Williams v. United States,* 401 *U. S.* 646, 91 S. Ct. 1148,

28 *L. Ed. 2d* 388 (1971); *Hill v. California,* 401 *U. S.* 797, 91 *S. Ct.* 1106, 28 *L. Ed. 2d* 484 (1971). It is not applicable here to the earlier search of the premises on June 5, 1969. Under the pre-*Chimel* cases the search of the locked closet was undoubtedly permissible as an incident to the arrest. See *United States v. Rabinowitz,* 339 *U. S.* 56, 70 S. Ct. 430, 94 *L. Ed.* 653 (1950); *Harris v. United States,* 331 *U. S.* 145, 67 S. Ct. 1098, 91 *L. Ed.* 1399 (1947); *cf. Williams v. United States, supra,* 401 *U. S.* 646, 91 S. Ct. 1148, 28 *L. Ed. 2d* 388; *Hill v. California, supra,* 401 *U. S.* 797, 91 S. Ct. 1106, 28 *L. Ed. 2d* 484.

The judgment of the Appellate Division is reversed and the judgment of conviction in the Law Division is reinstated in full.

*For reversal*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and MOUNTAIN—7.

*For affirmance*—None.