STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
ANTHONY BRADSHAW, DEFENDANT-APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued September 17, 1979—Decided October 2, 1979.

Before Judges ALLCORN, MORGAN and HORN.

*Ms. Cynthia M. Jacob*, Assistant Public Defender, argued the cause for appellant (*Mr. Stanley C. Van Ness*, Public Defender, attorney).

*Mr. Simon Louis Rosenbach*, Deputy Attorney General, argued the cause for respondent (*Mr. John J. Degnan*, Attorney General, attorney).

PER CURIAM.

Having been charged with the commission of the following crimes with Isaac Allen and Clyde Cofield, defendant Anthony Bradshaw was, after a lengthy trial, found guilty by a jury on June 12, 1976, of the murder of one Fred Reynolds, contrary to *N.J.S.A.* 2A:113–1 and *N.J.S.A.* 2A:113–2, and of the armed robbery of Wallace Hill and others, contrary to *N.J.S.A.* 2A:141–1 and *N.J.S.A.* 2A:151–5. On July 2, 1976 the trial judge sentenced defendant to life imprisonment on the murder conviction, after having merged the armed robbery conviction

into the murder conviction. Defendant filed a timely appeal raising a number of issues.

The conviction arose out of a series of crimes which took place on December 6, 1974. On that day, at about 11:10 p. m., three or four black men entered the barroom of the Bound Brook Hotel in Bound Brook, New Jersey. One of the men said, "This is a hold-up." A patron, Freddie Reynolds, responded, "Are you kidding?" Reynolds was immediately fatally shot in the right side of his chest by a man described as wearing a tan coat and carrying a sawed-off shotgun.

After the shooting the men robbed the patrons of the bar, who included George Chismar, Joseph Calvo, Peter Kulcyski and a bartender, Wallace Hill. The robbery victims were then herded into a cellar.

Shortly before the robbery and murder Lillian Leon, the assistant manager of the Brook Theater in Bound Brook, became suspicious of a car parked on the other side of the street, in front of the Town Tavern. The car was parked at an angle across the street, with its back end against the curb. The car's motor was running and its lights were on.

Samuel Leon, Lillian's husband, who had been a state trooper for 31 years, followed his wife's request to take down the car's license plate numbers. Leon noticed that a black male was behind the wheel of the car and that it appeared that two other black men were in the back seat. As Leon was observing the license plate numbers, a fourth black male left the Town Tavern and entered the car. This last man wore a long, camel-hair coat, which was wrapped tightly around him. The car which the Leons observed was a yellow, four-door, 1964 Buick, which was actually owned by codefendant Isaac Allen's mother.

Not long after the robbery five youngsters, Mark Clay, Donald Lindbach, Danny Hartman, Rosemary Killough and Donna Porch, were driving toward Lindbach's house to drop him off after a concert they had attended. After Clay (the driver) let

Lindbach out, a car appeared traveling at a high rate of speed. Hartman said the car was an old, yellow Buick. As the car passed Clay someone rolled down the front right-hand window and an object, which looked like a shotgun shell, was thrown on the ground. When Clay and his friends learned about the robbery they decided to go back to get the shell, which they found where it had been thrown. Hartman picked up the shell and gave it to Somerset County Detective Jack Gardner at the Bound Brook Hotel. Isaac Allen was arrested as a material witness in the early morning hours of December 7, 1974 as he returned home.

In the week following the murder of Reynolds, Detective Richard Thornburg of the Somerset County Prosecutor's Office received information from various sources linking defendant and codefendant Cofield with Isaac Allen on the night of the murder.

Defendant poses numerous arguments for reversal, which we discuss hereinafter. However, we find that none of them is persuasive. Accordingly we affirm.

## I

Defendant first argues that the investigative detention and subsequent interrogation of him violated his Fourth, Fifth, Sixth and Fourteenth Amendment rights.[1] Specifically, it is contended that the order signed by Judge Leahy on December 14, 1974 in response to Detective Thornburg's application for a search warrant did not legally authorize the detention, and therefore evidence which was obtained thereby and the answers of defendant to the interrogation which followed in consequence thereof were tainted, and the judge erred in denying defendant's motion to suppress said evidence.

---

[1] Freedom from unreasonable search and seizure and self-incrimination; right to assistance of counsel and due process.

 We considered this same argument in the appeal of Cofield, *State v. Cofield*, Docket A–1165–75, in which we rendered an unreported opinion on November 6, 1978. What we said there as to Cofield's contention on this point is applicable here.[2] We repeat:

Before defendant was "detained" a search warrant to enter defendant's dwelling was issued upon a verified complaint therefor. The warrant, in addition to authorizing said search, also authorized the police "to detain Clyde Cofield for a period of time not to exceed five (5) hours" for the purposes of his finger and palm printing, obtaining a blood sample and a hair sample, and his appearance in a lineup.

The texts of the Fourth Amendment and Art. I, par. 7, of the New Jersey Constitution are substantially the same. They each prohibit unreasonable searches and seizures, whether the seizures are characterized as arrests or as detentions. *Davis v. Mississippi*, 394 *U.S.* 721, 726–727 [89 *S.Ct.* 1394, 22 *L.Ed.*2d 676] (1969). The reasonableness of a detention is determined by balancing the need to seize for frisking or investigatory purposes against the intrusion which the seizure entails. *Terry v. Ohio*, 392 *U.S.* 1, 21–22 [88 *S.Ct.* 1868, 20 *L.Ed.*2d 889] (1968). Detention of a person under appropriate circumstances on less than probable cause has been recognized. *Davis v. Mississippi, supra; In re Fingerprinting of M.B.*, 125 *N.J.Super.* 115 (App.Div.1973); *Wise v. Murphy*, 275 *A.*2d 205, 211–218 (D.C.App.1971). See also *State v. Romeo*, 43 *N.J.* 188, 205–206 (1964), *cert.* den. 379 *U.S.* 970 [85 *S.Ct.* 668, 13 *L.Ed.*2d 563] (1965), where our court upheld detention of an individual who was present during a search of premises pursuant to a warrant. *Cf.* also, *State v. Hannah*, 125 *N.J.Super.* 290, 294 (App.Div.1973), certif. den. 64 *N.J.* 499 (1973).

There is no absolute test of when an arrest occurs. *State v. Bell*, 89 *N.J.Super.* 437, 443 (App.Div.1965). It is an issue with which our courts often have struggled. See *State v. Contursi*, 44 *N.J.* 422, 433–434 (1965); *Strelecki v. Coan*, 97 *N.J.Super.*, 279, 283 (App.Div.1967). In most instances where an individual is brought to a police station under compulsion for investigation purposes there is little to distinguish such a seizure from an arrest. *Cf. Cupp v. Murphy*, 412 *U.S.* 291, [93 *S.Ct.* 2000, 36 *L.Ed.*2d 900] (1973). Attention should be directed toward ascertaining whether there was probable cause or other basis for the detention, the reasonableness of the time and purpose of the detention, and whether a warrant should have been obtained therefor. Finding a label for the detention—arrest or otherwise—is an illusory objective in the light of the foregoing.

As recounted in the conclusions of Judge Meredith in denying the motion to suppress, the affidavit of Detective Richard Thornburg on which the search warrant and detention order were based reflected a compilation of facts that had

---

[2]The order to detain defendant was identical with the order pertaining to Cofield.

been gathered during the course of an intensive murder investigation. Although the individual facts iterated therein might not alone have demonstrated the presence of probable cause, those facts when considered together justified the issuance of the warrant. *United States v. Rubio,* 404 *F.2d* 678, 681 (7 Cir. 1968), cert. den. 394 *U.S.* 993 [89 *S.Ct.* 1482, 22 *L.Ed.2d* 770] (1969); *State v. McNair,* 60 *N.J.* 8, 14–16 (1972); *State v. Smith,* 129 *N.J.Super,* 430, 434 (App.Div.1974), certif. den. 66 *N.J.* 327 (1974). We need not narrate the events stated in Thornburg's affidavit. It will suffice to quote what we consider the reasonable conclusions therefrom as stated therein:

> "k. These facts and information at hand, the descriptions and composite drawings supplied by the victims of the armed robbery of the Bound Brook Hotel. The fact that on December 1, 1974, Allen, Cofield and Bradshaw were in the basement of the Allen residence sawing off a double barrelled shotgun. The specific identification of Allen's vehicle by Samuel Leon, Sr. prior to the commission of the crime within two blocks of the scene of the robbery murder, a second specific identification of the vehicle leaving the scene of the crime again within two blocks of the crime by both Mark Clay and Danny Hartman; the fact that on the occasion of the second sighting of the Allen vehicle a 12 gauge expended shotgun shell was thrown from the passenger side of the vehicle; the fact that the decedent, Fred Reynolds was murdered with a shotgun, the vehicle a 1964 Buick, New Jersey registration 435–BPM, in question having been seized by Court Order revealed evidence of human blood stains both within the vehicle and on the exterior of the vehicle; *the fact that two separate witnesses have placed these three individuals together in the Allen vehicle on the night of the robbery murder*; the fact that Anthony Bradshaw has bragged in the presence of an informant of Sgt. Joseph Triano's that he in fact perpetrated the armed robbery homicide under investigation as well as the fact that he physically assaulted a female witness and accused her of talking too much; the fact that each of these individuals have criminal arrest records relating to crimes of violence, all lend credence to deponent's belief that Bradshaw and Cofield have in fact participated in the armed robbery of the Bound Brook Hotel in the murder of Fred Reynolds and that a search of the residence and persons as *requested may reveal evidence relative* to this offense. [Emphasis added.]"

Contrary to defendant's contention, the affidavit provided a "well-grounded suspicion" that Cofield was one of the three who committed the crime. *State v. Waltz,* 61 *N.J.* 83, 87 (1972). It amply supported both the search and the seizure, as well as the detention.

■ Since our opinion in *Cofield* was delivered the United States Supreme Court decided *Dunaway v. New York,* —— *U.S.* ——, 99 *S.Ct.* 2248, 60 *L.Ed.2d* 824 (1979). Defendant relies strongly on that opinion. Before we discuss it, however, we will

recite some of the facts which are peculiar to defendant's case and that are different from Cofield's.

A search of defendant's house resulted in the seizure of a pair of sunglasses and a long coat. Codefendant Cofield's house was also searched and a black knit cap was seized. Defendant and Cofield were taken to the Plainfield Police Department and were placed in a lineup along with four black police officers from the Franklin Township Police Department. Defendant was "Number 5" in the lineup and Cofield was "Number 4."

Bartender Wallace Hill stated that Number 4, Cofield, "looked like" one of the perpetrators, and signed a statement identifying Cofield as one of the robbers. George Chismar, one of the bar's patrons at the time of the robbery-murder, said he had seen defendant "some place before recently" and that defendant was the same height as the person who did the shooting at the bar. John Warner, the owner of the bar, said he believed he had seen Number 5 (defendant) in the bar prior to the robbery. Joseph Calvo said that Number 5 had the same features and height as the person who had the shotgun during the robbery.

During the course of the lineup defendant allegedly said to Officer Edward Coleman, who was in the lineup as well, "If I get out of this, I'm booking." "Booking" was contemporary slang for, among other things, fleeing.

Following the lineup defendant was questioned by police. During the questioning of defendant, Cofield told police that defendant was involved in the robbery and murder, and defendant was told that he would be charged with robbery and murder.

Later that evening defendant was taken to Somerset County Jail. Upon seeing Cofield, defendant allegedly said, "I hear you've been talking, Clyde. As long as you keep quiet you've got nothing to worry about. You better not talk, Clyde." Defendant eventually gave a statement to the police.

In *Dunaway v. New York, supra,* the United States Supreme Court held that a custodial questioning on less than probable cause for a full-fledged arrest was unconstitutional. 99 *S.Ct.* at 2258. The court also held that even if a defendant were given proper *Miranda* warnings before custodial questioning, the fruits of that questioning would still be inadmissible if the questioning were a result of an illegal detention.

The import of the *Dunaway* decision is clear. The Supreme Court strongly rejected the State's suggestion in that case that it "adopt a multifactor balancing test of 'reasonable police conduct under the circumstances' to cover all seizures that do not amount to technical arrests." 99 *S.Ct.* at 2257. The court recognized that the danger that the Fourth Amendment protections intended by the framers of the Constitution

> * * * could all too easily disappear in the consideration and balancing of the multifarious circumstances presented by different cases, especially when that balancing may be done in the first instance by police officers engaged in the "often competitive enterprise of ferreting out crime." [*Ibid.*]

The court held that "[a] single, familiar standard is essential to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront." *Ibid.* That standard is, of course, probable cause.

Defendant claims that his situation is identical to that of the defendant in *Dunaway,* and that based on the decision in *Dunaway* defendant's conviction should be reversed. However, defendant overlooks some significant dissimilarities in the two cases:

First, the *quantum* of evidence obtained by police before seizure of defendants was much more extensive in the instant case than in *Dunaway.* In *Dunaway* a police informant gave the police unsubstantiated third-hand hearsay that someone

named "Irving" (defendant Dunaway's first name) had been involved in a robbery-murder at a pizza parlor. *Id.* at 2251. In the case at bar Detective Thornburg had compiled the evidence described above from several sources linking defendant with the crime at the Bound Brook Hotel. It is important to note that the police in the instant case had far more evidence pointing to defendant's involvement in the Bound Brook Hotel incident than did the police in *Dunaway*.

The police conduct in this case is strikingly different from that in *Dunaway*. In the latter the police were ordered by a supervising detective to "pick up" Dunaway and "bring him in" for questioning. Although Dunaway was not told he was under arrest when taken into custody, he would have been physically restrained if he had attempted to leave. *Ibid.* Dunaway was driven to police headquarters in a police car and placed in an interrogation room, where he was questioned by officers after being given *Miranda* warnings. Dunaway waived counsel and eventually made statements and drew sketches that incriminated him in the crime. *Ibid.*

In the case at bar the police did not seize defendant on the basis of an unsubstantiated rumor. Rather, Detective Thornburg detailed in a long affidavit the reasons for his request to search the residences of defendant and codefendant Cofield, and for his request to detain those two men. The detention order signed by Judge Leahy did not provide for investigative questioning of defendant or Cofield—rather, the two men were to be brought to police headquarters for the purpose of fingerprinting and palm printing, having blood and hair samples taken, and being placed in a lineup. It is significant that defendant was only questioned by police concerning the Bound Brook Hotel robbery-murder *after* he was identified in a lineup and *after* he had told a police officer during the lineup, "If I get out of this, I'm booking."

The United States Supreme Court in *Brown v. Illinois*, 422 *U.S.* 590, 95 *S.Ct.* 2254, 45 *L.Ed.2d* 416 (1975), as well as in *Dunaway*, made it clear that a statement given to police as the result of an unlawful arrest would have to be suppressed, even if that statement were given after appropriate *Miranda* warnings. In both of these cases, however, the defendants were seized without probable cause during police investigations, brought to police headquarters and immediately questioned. By contrast, in the case at bar the police, before they questioned defendant, had all the information contained in Detective Thornburg's affidavit *plus* eyewitness identifications *plus* defendant's incriminating statement during the lineup. In addition, before defendant made the statement to police that was used in evidence against him, the police had obtained an admission from Cofield that defendant was involved in the robbery and murder. At that point the police certainly had probable cause to arrest defendant, and his subsequent statement should surely be admissible, unless it were the fruit of an illegal detention.

The investigative detention of defendant in this case was legal, for several reasons. First, unlike *Brown v. Illinois* or *Dunaway v. New York*, defendant in the instant case was not originally brought to police headquarters for questioning. In *Davis v. Mississippi*, 394 *U.S.* 721, 89 *S.Ct.* 1394, 22 *L.Ed.2d* 676 (1969), the Supreme Court considered whether fingerprints taken from a suspect detained without probable cause must be excluded from evidence. The court said:

 \* \* \* Detention for fingerprinting may constitute a much less serious intrusion upon personal security than other types of police searches and detentions. Fingerprinting involves none of the probing into an individual's private life and thoughts that marks an interrogation or search. [at 727, 89 *S.Ct.* at 1398]

However, the court found it unnecessary to decide the validity of "narrowly circumscribed procedures for obtaining" fingerprints, because the petitioner in *Davis* had been not merely fingerprinted but also subjected to interrogation. *Id.* at 728, 89

*S.Ct.* 1394. The importance of *Davis* in the factual context before us lies in its implicit recognition that some types of seizures which are not as intrusive as investigative questioning can be implemented on less than probable cause to arrest. See also *Terry v. Ohio*, 392 *U.S.* 1, 88 *S.Ct.* 1868, 20 *L.Ed.*2d 889 (1968) (stopping and questioning allowed upon "reasonable suspicion of criminal activity"); *Adams v. Williams*, 407 *U.S.* 143, 92 *S.Ct.* 1921, 32 *L.Ed.*2d 612 (1972) (frisk for weapons on basis of reasonable suspicion); *United States v. Brignoni-Ponce*, 422 *U.S.* 873, 95 *S.Ct.* 2574, 45 *L.Ed.*2d 607 (1975) (investigative border patrols allowed to stop automobiles for brief questioning).

In the instant case the order allowing the investigative detention did not sanction interrogation of defendant. Only after the police had probable cause to arrest (*i. e.,* after Cofield's statement linking defendant to the robbery-murder) did defendant make an allegedly inculpatory statement to police.

Moreover, the seizure of defendant in the instant case, unlike the seizure of the defendants in *Brown v. Illinois, supra,* or *Dunaway, supra,* was done with judicial approval. Judge Leahy had signed the search and detention orders. One of the prime concerns of the court in *Dunaway* was that police officers would, in the heat of an ongoing investigation, tend to overlook or ignore Fourth Amendment considerations in their eager quest to garner information. 99 *S.Ct.* at 2248. Here Detective Thornburg thoroughly detailed the status of the ongoing investigation into the Bound Brook Hotel robbery-murder and his reasons for seeking search and detention warrants. The fact that search and detention warrants were signed by Judge Leahy afforded defendant an important protection against unsupervised police activity.

Finally, the *quantum* of evidence the police had against defendant and Cofield was far more extensive than the evidence supporting the seizures in *Dunaway* or *Brown v. Illinois.* In *Dunaway,* as stated previously, the police relied upon third-hand,

imprecise hearsay in seizing Dunaway for questioning. In *Brown v. Illinois* the police had even less to go on. They seized the defendant in that case on the basis that the victim's brother listed Brown as an acquaintance of the victim. At the time of his seizure there was no significant evidence linking Brown with the murder. See 422 *U.S.* at 592–593, 95 *S.Ct.* 2254.

In contrast, as outlined in Detective Thornburg's application for search and detention warrants, the police in the case before us had indications from several sources that defendant might have been involved in the robbery-murder at the Bound Brook Hotel. Defendant was spotted by two separate sources as being with codefendants Allen and Cofield on the night of the murder; defendant was seen in the basement of Allen's residence sawing off a double-barrelled shotgun five days before the murder; the police had information that defendant had bragged about his participation in the Bound Brook Hotel robbery and defendant had allegedly physically assaulted a female witness for talking too much about his links to Allen and Cofield on the night of the crime.

In sum, the case at bar is clearly distinguishable from *Brown v. Illinois* and *Dunaway v. New York*. The police, two judges have held, had a "well-grounded suspicion" to believe that Cofield and defendant were involved in the robbery-murder at the Bound Brook Hotel. The search and detention warrants in the instant case were passed upon by an impartial judge. Defendant did not give the police any incriminating statement until after there was probable cause to believe he was a participant in the crime.

We need not determine whether *Dunaway* holds that the presence of probable cause is necessary in all cases of police detention for a brief period or whether it is necessary only where the detention is for the purpose of interrogation. In this case we are satisfied that the circumstances brought to the attention of Judge Leahy disclosed that there was probable cause for believing that defendant had in fact committed the

murder and robberies. *Carroll v. United States*, 267 *U.S.* 132, 162, 45 *S.Ct.* 280, 69 *L.Ed.* 543 (1925); *State v. Kasabucki*, 52 *N.J.* 110, 116 (1968); *State v. Burnett*, 42 *N.J.* 377, 386 (1964). We would only add that a "well-grounded suspicion" has been equated to probable cause. *State v. Waltz, supra; State v. Burnett, supra.*

## II.

[The court found without merit defendant's further arguments that his second trial, after there had been a mistrial, amounted to double jeopardy; that the prosecution's overbroad subpoenas duces tecum prevented the exposition of testimony favorable to defendant; that his statement to the police was invalidly obtained and that his in-court and out-of-court identifications were invalid.]

Affirmed.